**UNITED CONGREGATIONAL CHRISTIAN CHURCH OF THE SOUTH BAY IN SAMOA, and UNITED CONGREGATIONAL CHURCH OF THE SOUTH BAY, LOS ANGELES,**
Plaintiffs/Counter-defendants

v.

**SESE McMOORE, RAYMOND McMOORE and DOES 1 through 10,**
Defendants/Counter-claimants

High Court of American Samoa
Trial Division

CA No. 13-92

September 6, 1995

Before KRUSE, Chief Justice, LOGOAI, Associate Judge, and BETHAM, Associate Judge.

Counsel:     For Plaintiffs/Counter-defendants, Afoa Moega Lutu
For Defendants/Counter-claimants, Togiola T.A. Tulafono

Decision and Order:

Plaintiffs/Counter-defendants, United Congregational Christian Church in South Bay in Samoa (hereafter "UCCC Samoa") and United Congregational Christian Church of the South Bay, Los Angeles (hereafter "UCCC LA") seek to enjoin defendants, Sese and Raymond McMoore (hereafter collectively referred to as the "McMoores"), from entry onto a certain four acre parcel of individually owned land known as Soata (hereafter "Soata") located in the Tafuna plains. The McMoores have in turn counter-claimed for compensatory damages, alleging that they had made loans to plaintiffs over the years to repay UCCC Samoa's $120,000 loan with Amerika Samoa Bank, and for security services they claim to have rendered in connection with Soata over a number of years. For reasons given herein, we grant plaintiffs' petition for injunctive relief and deny the McMoore's counter-claim for damages.

The UCCC LA is a congregational church established some twenty years ago in Carson City, Los Angeles, by various Samoan residents of that area. In its temporal affairs, the UCCC LA prospered in its bingo fund raising activities (Myron Thompson, a former Secretary of the UCCC LA, testified that the church was the foremost bingo operator in Carson City) and consequently looked to purchasing land in American Samoa. On June 16, 1982, it paid High Talking Chief Pagofie Sasa`e the sum of $100,000 for Soata, as evidence by Pagofie's Warranty Deed of the same date recorded with the Territorial Registrar in Volume IV, Transfers at pages 244-45.

With the land purchase in American Samoa, certain officials of the UCCC LA began working on a grand scheme to build a $3 million plus structure on Soata, to be known as the "Samoana Conventional Center." The main planning goal behind the structure was a facility to generate local revenue, largely through bingo games, to fund different church related projects.[1] To this end, UCCC LA sought and secured toward the end of 1985 the appropriate government land use permit for the project, with work beginning shortly thereafter. Then president of the UCCC LA, John Thompson, moved to American Samoa bringing with him Frank Onys, the UCCC LA's mainland contractor, to undertake construction of the convention center. Thompson apparently thought it desirable to incorporate a separate local entity, affiliated with the local Congregational Christian Church in American Samoa, to hold church property and undertake the UCCC LA's activities in the territory. Accordingly, a charter was sought, and one was issued on July 10, 1986, for the UCCC Samoa. Additionally, a separate entity, structured for profit, known as "Samoana, Inc." was also incorporated to handle the church's local business affairs.

On July 26, 1986, a document styled "Deed Transfer" was executed by John Thompson as President of the UCCC LA,[2] and witnessed by Myron Thompson as "Board Secretary," to convey Soata to "the United Samoan

---

[1] *Cf.* A.S.C.A. § 37.0204(b) ("It is prohibited to alienate any lands except freehold lands to any person who has less than half native blood. . . .") and § 37.0204(d) ("This section does not prohibit the conveyance and transfer of native land . . . to an authorized, recognized religious society, of sufficient land for the erection thereon of a *church or dwelling house for the pastor of both.* . . .").

[2] While the instrument recites the "bylaws" as the source of John Thompson's presidential authority to alienate the UCCC LA's real property, the current bylaws invest that authority in the Board of Trustees, subject to ratification by two-thirds of the church's membership. *See* Bylaws of UCCC LA, Art. IV, § 4(a).

Congregational Christian Church of Samoa in the village of Tafuna, American Samoa."[3]

After securing a mainland loan for construction of the Soata project, the UCCC LA shipped equipment and a large quantity of construction material to the territory. The initial construction work, however, also utilized a credit facility with the Amerika Samoa Bank, taken out by John Thompson on behalf of UCCC Samoa. This debt totalled $120,000, which was later converted to a term loan. It was not clear on the evidence just how much money was obtained from the off-island loan; however, it was a substantial amount and not all of loan proceeds found their way to the construction project in Samoa. As events turned out, the ongoing expenses at Soata and the repayment of the Amerika Samoa Bank loan were being financed through locally operated bingo games.

In setting up its local bingo operation, the UCCC LA imported its more sophisticated bingo paraphernalia from Carson City, as well as a number of its seasoned bingo employees. The local operation soon elevated "occasional" church bingo to new heights in the territory.[4] In July 1986, the UCCC LA began running "regular" gaming activities several days each week, first at Fatuo`aiga and then at the VA Club premises. The bingo games were held out under the sponsorship of the "Samoana Fellowship," the same name by which the UCCC LA's bingo operation was known by in Carson. The bingo revenue was handled exclusively at the outset by John Thompson, who also opened up an Amerika Samoa Bank checking account with Onys and himself as the account signatories.

Defendant Raymond McMoore's (hereafter "Raymond") involvement with the UCCC LA's local activities arose through his relationship with John Thompson, who was also his maternal uncle. Although not a member of the UCCC LA, Raymond assisted his uncle with the Soata project from the outset, and he was consequently put on the payroll at $5.00 an hour. His range of duties was general in nature, involving both the construction project and the bingo games.

---

[3] Although not explained on the evidence, the instrument was only offered for registration with the Territorial Registrar on February 1, 1990, some four years after its execution.

[4] Except for the "occasional" *bingo* game or *raffle* for religious, educational, or charitable purposes, it is a criminal offense in the territory to engage in gambling. *See* A.S.C.A. §§ 46.4301-4302. Notwithstanding, the UCCC LA also introduced at least one gaming novelty, beyond the lawfully exempted "raffle" or "bingo" game, known as "pull tabs," a chance game that mirrors the operating principle of the Las Vegas slot machine.

In mid 1987, Mr John Thompson returned to the mainland because of medical problems and never returned to the territory. He passed away in Los Angeles in December 1988. In Thompson's absence, Raymond assumed supervision of the bingo operation and the handling of its revenue, including the making of deposits, while Onys continued with the construction at Soata, and also the signing of checks on the local account. The work, however, effectively came to a halt when the project was about 30 percent complete. According to Onys, the construction had reached a stage where it could not go forward without certain needed material, while at the same time he was informed by Raymond that bingo revenues were becoming barely sufficient to cover operating expenses.

In October, 1988, Onys returned to the mainland. With his departure, the Soata project not only came to a standstill but eventually went to waste, and so continues to this very day. Completed work as well as a substantial quantity of building material and equipment left on the site either became dilapidated or disappeared over time.

From our assessment of the evidence, a principle reason for the stagnant state of affairs with Soata was an ensuing power struggle which arose among UCCC LA officials following the demise of John Thompson, in December 1988, and the immediately succeeding death of UCCC LA's longstanding minister, Rev. Malaki Tauiliili, in the month of January, 1989. In Carson City, the dispute came to a head with the filing of cross-lawsuits in the Superior Court of California for the County of Los Angeles. These suits resulted in the Superior Court's issuance of permanent injunction on January 6, 1993, enjoining Myron Thompson (who is also the son of the late John Thompson) and others from, among other things, further holding themselves out as UCCC LA representatives authorized to deal with UCCC LA property, including a bank account with the Amerika Samoa Bank.

In American Samoa, several attempts by UCCC LA officials to enter Soata, beginning early in 1990, were actively resisted by Raymond, who confronted these delegations with demands for large sums of money. On one such occasion, Raymond had people posted on the land, including a few who just happened to be working in and around the area with bush knives, with instructions to keep everybody out. In the interim Raymond, then assisted by his wife Sese McMoore (hereafter "Sese"), undertook the

bingo games for their own purposes.[5] The McMoores' resistance to plaintiffs' attempts to take possession of Soata brought about the matter now before us.

The McMoores assert some vague entitlement claim to possession of Soata until they are paid their claim for monies loaned to UCCC LA. They simply contend that this was their agreement with John Thompson. We see no basis for the McMoores' possessory claims. Their retention of Soata and interference with plaintiffs' attempts to go upon the land is tantamount to actionable trespass.[6] Among their affirmative defenses to plaintiffs' claim for injunctive relief, the McMoores attempt to assail plaintiff UCCC LA's entitlement to take possession of Soata, citing non-compliance with the territory's native land alienation laws, A.S.C.A. § 37.0201 *et seq*. This, however, is nothing but a sham defense, since it does absolutely nothing to advance defendants' position in the slightest manner. As between the parties, and notwithstanding the Native Land Alienation statute, plaintiffs' payment of $100,000 to High Talking Chief Pagofie constitutes at least one hundred thousand more reasons than the McMoores have to lay superior possessory claims to Soata. In short, the McMoores can provide no basis whatsoever to set up an adverse possessory claim to Soata. Their relief, if any, lies in damages and, therefore, plaintiffs' petition for injunctive relief should be granted.

We turn to the McMoores' counter-claim for damages. The basis of this claim is an alleged oral promise made by John Thompson to Raymond over the telephone. According to Raymond, after failure of the church's bingo, John Thompson had requested him to engage Sese's bingo to repay the Amerika Samoa Bank loan. Raymond claims that John Thompson had further promised that the McMoores would be reimbursed for such payments on the loan. In support of Raymond's claim, his cousin Myron Thompson testified that he was privy to the telephone conversation *between his father and Raymond.*

On our review of the evidence, we find that the bingo operation subsequently undertaken jointly by the McMoores, the proceeds of which were used to pay the Amerika Samoa Bank loan, was in essence a

---

[5]    Sese had previously been involved with bingo games sponsored by the Office of Samoan Affairs to raise funds for the annual Flag Day celebrations. This "flag day" bingo activity of Sese's continued indefinitely beyond Flag Day to include bingo games in the name of different church groups.

[6]    Plaintiffs, however, do not seek damages.

continuation of the very same bingo operation started by UCCC LA. Sese's questionable "flag day" bingo operation,[7] simply merged with the UCCC LA's "Samoana Fellowship" bingo, the label long used and promoted by the UCCC LA both off-island as well as on-island. Insolvency of the UCCC LA's gaming operation, as claimed by Raymond, proved to be of Raymond's own doing. On the one hand, he failed to provide any accounting to anybody except, as he claims, to his deceased uncle; on the other hand, the sampling of bank deposit slips for the UCCC Samoa's checking account, furnished by the McMoores upon the plaintiffs' discovery requests, reveal that Raymond simply stopped depositing the UCCC LA's bingo cash receipts and only banked the checks received.

■ The bingo games, on the other hand, when run as a McMoores' venture, subsequently became profitable enough to maintain current loan payments with Amerika Samoa Bank. At the same time, we are satisfied that the bingo's association with the UCCC LA continued to provide the appearance of legitimacy to the continuing gaming operation. We have difficulty reconciling the gaming statute, A.S.C.A. § 46.4302 *et seq.*, with the McMoores' bingo "operator" status. Furthermore, even if Sese's bingo could, for the sake of argument, be viewed as a legitimate exception to the gaming prohibition, she has failed to convince us that a legitimate "religious, educational, or charitable purpose," within contemplation of the gaming statute's proviso, includes "loan-making." Money lending is quite clearly not within the ambit of the gaming statute's proviso. *See* A.S.C.A. §§ 46.4301-02. Finally, we attach no weight to Raymond's self serving claim of an oral contract with John Thompson, nor to the corroborative attempt by his cousin Myron Thompson. We find their credibility questionable and their motives suspect. They were thwarted earlier in

---

[7] In light of the gaming statute, A.S.C.A. §§ 46.4301-02, and its rather limited proviso, the evidence in this case points incredulously to a nascent and self-regulating gaming industry on-island involving operators principally set up for that purpose. There does not seem to be anything "occasional" about bingo games, nor does there appear to be much regard to the proscription against the keeping of gaming equipment, employees, and premises for gaming activity. The evidence before us alluded to gambling activity where cash transactions appeared to be the norm, even in the compensation of employees, with doubtful accounting. In terms of receipt splits between the operator and a particular church for whom the bingo is held out, Sese testified that she started off conducting bingos for different churches, initially under her "flag day" bingo license, under an arrangement whereby the church would take a part of the receipts, while allowing her to do what she wished with the remainder. Raymond additionally testified that Samoana Fellowship has now progressed to undertaking bingo games in its own stead, thereby exercising discretion in the distribution of the bingo profits, in order to make it "fair" for everyone. It would seem that the bingo operator is now defining the level between what is expense and what is profit, for purposes of the gaming statute.

their attempt to cash an insurance check on-island in the amount of $41,919.38, being the proceeds of a life insurance policy taken out by the UCCC LA on the life of Rev. Tauiliili, payable to UCCC LA as beneficiary. Both Raymond and Myron appear to have difficultly accepting the fact that their once dominant family influence on the temporal and business affairs of plaintiffs, both in Los Angeles and in American Samoa, ended with the demise of John Thompson and the immediately ensuing election of substitute officials of the UCCC LA and UCCC Samoa. Indeed, in what seems to have been an after-thought, the theory first emerged on the witness stand (tendered as a basis for a possession claim by the defendants) that the UCCC Samoa was comprised exclusively of the Thompsons, the McMoores, and even perhaps attorney Albert Mailo, who was involved with incorporating UCCC Samoa. We see no basis in fact nor in law for this remarkable claim. We conclude that the Amerika Samoa Bank loan was in actuality discharged by plaintiffs' bingo revenue receipts, and not by the McMoores individually.

Similarly, we are also satisfied on the evidence that the expenses with regard to the night watchman who was initially on the premises after Onys' departure, was met with Samoana Fellowship bingo revenues. We find the McMoores' subsequent claimed security services, for which compensation is sought, to be utterly without merit. Soata went to waste; it was not looked after, and a principal reason for the near total waste and substantial loss of property evident at the site was Raymond's efforts in blocking plaintiffs' access to Soata in the first place. If anything, damages would seem to more appropriately lie against the McMoores.

On the foregoing, it is the judgment of the court that the defendants Raymond and Sese McMoore, their agents, employees, representatives, and all persons acting in concert with them, are hereby permanently enjoined from going upon the land Soata, and/or from interfering in any manner whatsoever, whether directly or indirectly, with plaintiffs' possession of Soata. Further, it is also the judgment of the court that the defendants take nothing on their counter-claim for damages.

It is so ordered.